[Cite as *State v. Hunt*, 2018-Ohio-4183.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | Case No. 17CA3811 |
| v. | : | |
| | | DECISION AND |
| DOUGLAS L. HUNT, | : | JUDGMENT ENTRY |
| Defendant-Appellant. | : | RELEASED 10/12/2018 |

APPEARANCES:

Matthew F. Loesch, Portsmouth, Ohio, for appellant.

Shane Tieman, Scioto County Prosecuting Attorney, and Jay Willis, Scioto County Assistant Prosecuting Attorney, Portsmouth, Ohio, for appellee.

Hoover, P.J.

{¶1}   Defendant-appellant, Douglas L. Hunt ("appellant"), appeals his convictions entered in the Scioto County Court of Common Pleas. Following a jury trial, appellant was found guilty of one count of aggravated murder, one count of murder, three counts of endangering children, one count of tampering with evidence, and one count of gross abuse of a corpse.

{¶2}   On appeal, appellant first contends that insufficient evidence supports the jury's verdicts, or alternatively, that the verdicts are against the manifest weight of the evidence. Because we find that any rational trier of fact could have found the essential elements of the crimes proven beyond a reasonable doubt, and because substantial evidence supports the verdicts, we disagree. Appellant next contends that the trial court erred when it denied his motion for continuance of the jury trial. Because we find that the trial court acted within its discretion when it denied the motion, we disagree. Appellant next argues that the trial court abused its discretion when it limited his cross-examination of his co-defendant. We disagree. The co-

defendant had previously answered appellant's question, and the trial court did not abuse its discretion by limiting repetitive testimony that only served to harass the witness. Appellant next claims that the trial court committed plain error when it failed to give a jury instruction regarding the credibility of accomplice testimony pursuant to R.C. 292303(D). Because appellant has not shown that, but for the trial court's failure to give the required jury instruction, the outcome of the trial would clearly have been otherwise, we disagree. Appellant next contends that his trial counsel's failure to request the jury instruction on accomplice credibility, to object to improper opinion testimony, to object to prior bad acts evidence, and to object to improper prosecutor remarks constitutes ineffective assistance of counsel. We disagree.  Appellant next contends that the prosecutor made improper comments during closing argument that affected the fairness of his trial. Because we conclude that the remarks of the prosecutor do not amount to prosecutorial misconduct, we disagree. Appellant next contends that the trial court erred in failing to order a jury view of the scene. Because substantial evidence detailing the scenes of the crimes were introduced and admitted into evidence, we do not believe that the trial court abused its discretion in denying the motion for a jury view. Appellant next asserts that the trial court abused its discretion when it allowed the State to introduce improper hearsay testimony. Because we find the testimony was subject to a hearsay exception, we disagree. Finally, appellant contends that the cumulative error rule requires reversal of his convictions. Because multiple errors did not occur in the proceedings below, we disagree.

{¶3}    Accordingly, we overrule all of appellant's assignments of error and affirm the judgment of the trial court.

## I. Facts and Procedural History

{¶4}     A Scioto County Grand Jury indicted appellant for one count of aggravated murder, one count of murder, three counts of endangering children, one count of tampering with evidence, and one count of gross abuse of a corpse. Thereafter, the State amended the indictment to clarify the dates that the alleged offenses occurred. The case centered on the death of a 6 year-old child, Tyler Joseph Caudill ("TJ"). Margarita White ("White"), TJ's mother, was also indicted on identical charges as a co-defendant.

{¶5}     On August 28, 2017, appellant moved for a continuance of the jury trial that had been scheduled for September 5, 2017. Appellant's motion for continuance was based primarily on the fact that his co-defendant, White, had agreed to enter a guilty plea and to testify against him. The trial court denied the motion for continuance the following day; and White was officially disclosed by the State as a witness against appellant on August 31, 2017.

{¶6}     Appellant's case proceeded to jury trial on September 5, 2017. The State presented numerous witnesses, including co-defendant White. Appellant did not present any testimony in his case-in-chief. The following facts are adduced from appellant's trial.

{¶7}     Michael Caudill testified that he was TJ's biological father. He stated that he and TJ's mother, White, dated on and off for several years; but that the relationship ultimately ended in them agreeing to mutually separate. He testified that following their separation, for about the next year and a half, "everything went great"; and the two shared custody of TJ without issue. He also testified that during this time period TJ was a "happy, healthy baby boy" except for the occasional fit that resulted from TJ's autism. He testified that the relationship between himself and White began to deteriorate when White moved in with appellant around summer of 2015. After White began living with appellant, it became progressively more difficult for Caudill to contact White and to see his son. Caudill testified that the last time he saw TJ was on August 8,

2015, at TJ's fifth birthday party. After that date he testified that he could no longer contact White or his son despite exhaustive efforts to reach them. He contacted police to conduct a welfare check and children service agencies in both Ohio and Kentucky; but the authorities had trouble locating White, appellant, and TJ. Caudill testified that he also contacted the juvenile court and an attorney in an attempt to acquire custody of TJ but was told that he needed a physical address to serve paperwork; but at the time he could not locate appellant, White, or TJ.

{¶8}     Lorainia Caudill, TJ's paternal grandmother, also testified at trial. She testified that she regularly visited TJ until the time when White began dating appellant. When White first began dating appellant Lorainia testified that she went from "having [TJ] four evenings and 25-30 hours on the weekend to having him like two weekends a month." At that time, Lorainia testified that TJ was "a healthy child, had no issues, other than being autistic." After TJ's fifth birthday party on August 8, 2015, Lorainia testified that White quit responding to any of her or her son's attempts to visit TJ. Lorainia Caudill also testified that around August 2015, White was living with appellant and TJ and the bunch were constantly moving to new locations. She testified that eventually she and her son were unable to locate White or to speak to her through any means. Lorainia testified that by Spring 2016 she learned that no extended family members had seen TJ for quite sometime, so she and her boyfriend began canvassing neighborhoods in Portsmouth six to seven nights per week in an attempt to locate TJ. Lorainia testified that she hoped to find an address where White, appellant, and TJ were staying so that she and her son could file for custody. While canvassing neighborhoods, Lorainia followed White and appellant on several occasions, but never could find TJ or an address where he might be staying. Lorainia testified that she took notes of the times and locations where she viewed White and appellant, and handed those notes over to the police and to children services.

{¶9}    Joe Augustin, a Nurse Practioner at the Southern Ohio Medical Center ("SOMC") in Portsmouth, Ohio, testified in regards to an ER visit on September 11, 2015. Augustin testified that TJ was referred to the ER from SOMC Pediatrics in regards to a leg fracture that occurred after a fall from a stool two days earlier. Augustin testified that no other injuries were noted aside from bruising and swelling at the location of the fracture. Augustin ordered an orthoglass splint to be applied, provided a prescription for pain medication, and referred TJ to SOMC Orthopedics.

{¶10}   Dr. Scott Logan, Director of Medical Imaging at SOMC, testified regarding the X-rays taken during the September 11, 2015 visit to the ER. Dr. Logan testified that the fracture that occurred on the left leg was a spiral fracture, which can be consistent with accidental or non-accidental trauma.

{¶11}   Lieutenant Michael Hamilton of the Portsmouth Police Department was the next witness to testify at trial. Lieutenant Hamilton testified that he was the lead investigator on the missing person/homicide case. Initially, Lieutenant Hamilton's investigation concerned locating appellant, White, and TJ. Lieutenant Hamilton referred to White and appellant as being "on the lam[]" and "very hard to locate". Lieutenant Hamilton testified that with the help of the Scioto County Sheriff's Office, and law enforcement officers in Kentucky, White was eventually located and arrested[1] in the parking lot of the Gatti's restaurant in Portsmouth. At the time of her arrest, White agreed to take Detective Jodi Conkel of the Scioto County Sheriff's Office to where TJ could be located. Lieutenant Hamilton testified that Detective Conkel and White went off on their own, and shortly thereafter Detective Conkel called him and told him to immediately come to the 1500 block of Mabert Road in Portsmouth. Officers then arrived at a vacant house at 1522 Mabert Road, where White had directed Detective Conkel to TJ's dead body. The body was

---

[1] Officers had obtained a warrant for White for her failure to enroll TJ in school.

located on the side of the house - in a black bag underneath a tabletop - and was badly decomposed. Lieutenant Hamilton testified that he experienced the most putrid smell of human decomposition in his 19 years on the job.

{¶12}  Lieutenant Hamilton testified that upon discovering the body he immediately secured the scene, called in additional law enforcement including the Bureau of Criminal Investigations, and started the process of obtaining a search warrant for the residence. White was then transferred to the Sheriff's Office for questioning. It was soon learned that a blue and white cooler had been used to transport the deceased child from the Royal Inn motel to the 1500 block of Mabert Road. Lieutenant Hamilton testified that he found the blue and white cooler in the yard of the residence at 1524 Mabert Road.

{¶13}  Also during Lieutenant Hamilton's testimony, appellant's interview with law enforcement was played for the jury. During the interview, appellant stated that he had been in a three-year relationship with White; but that the past "five or six months have been on and off." Appellant told the detectives that he has two other kids with White, and that they had lived in Portsmouth; Huntington, West Virginia; South Shore, Kentucky; and then returned back to Portsmouth in June 2016. He stated that upon their return to Portsmouth they had been homeless for a period, had lived in a truck, squatted in abandoned houses, and also had lived at the Royal Inn sometime in July or August 2016. He denied that TJ was malnourished, that he ever withheld food or water from TJ, and denied having any part in TJ's death. He stated that White had given up custody of TJ to a friend or aunt; and he never saw him again. Appellant claimed in his interview with law enforcement that he played a large role in TJ's development, including improvements in the area of bathroom training and general behavior. Appellant claimed during the interview that he only used appropriate disciplinary methods with TJ.

{¶14}   Darren Queen, a part time employee at the Royal Inn in Portsmouth, also testified. Queen testified that he took payment from White on a number of occasions while she was staying at the Royal Inn in the summer of 2016. Queen stated that he saw White on a daily basis while she was living there; but that appellant stayed in the room more than White. Queen testified that White was living at the motel with the appellant and two children; and that they had stayed from about August 10, 2016 to September 27, 2016. On cross-examination, Queen testified that of all the times he saw White, he never observed bruising or other signs of violence.

{¶15}   Carol Withrow, an employee at City National Bank in Cross Lanes, West Virginia, was the next witness to testify for the State. Withrow testified that White was TJ's representative payee for his SSI disability claim in the amount of $733.00 per month.

{¶16}   Dr. Elizabeth Kryszak, a clinical psychologist at Nationwide Children's Hospital in Columbus, Ohio, testified about TJ's autism diagnosis. Dr. Kryszak testified that she first evaluated TJ in March 2013 and diagnosed him with autism. The last time that she saw TJ was in March 2014 at a follow-up appointment. She stated that no serious health concerns were reported to her during her evaluations in 2013 and 2014. Dr. Kryszak, in her prior evaluations of TJ, noted that screaming was his primary consistent behavior for various different reasons, along with flapping of his hands, grinding his teeth, and walking on his toes. Dr. Kryszak testified that TJ appeared to be physically healthy the last time she saw him in March 2014, and that White reported that he was eating well at that time. Dr. Kryszak testified about a number of recommendations she made to White to help TJ's developmental and behavioral issues, but noted that White never returned TJ for another follow-up appointment.

{¶17}   Charles Lennex, Jr., the next witness called by the State, admitted to being a prior felon and drug addict. Lennex testified that he was familiar with appellant and had been for a

number of years. Lennex testified that he saw appellant sometime in 2016, when "it was hot" outside, and that appellant was living in a truck with White and three kids. Lennex testified that the next time he saw appellant, appellant was living at the Royal Inn; and Lennex met him there to sell him Suboxone. Lennex testified that he would meet appellant at the Royal Inn once or twice a week to sell him Suboxone, but that appellant would never let him into the motel room. Lennex stated that White and three children were living at the motel with appellant. Lennex testified that appellant and White then moved to a house on Mabert Road and was living with a woman and with Mitch Waring. Lennex testified that he visited the house a few times to sell drugs, and witnessed appellant and White inject Suboxone at the residence. Lennex testified that, later in the fall of 2016, appellant came to his house and said White was talking to the police, and that "he was going to go to prison * * * [that] someone died and it –he said if someone died and you're the coseer (sic) over them, then obviously, it's going to come back on you regardless." According to Lennex, later on appellant said it was "the kid, a baby" that had died, and that he had moved the body. Lennex testified that he later met with detectives from the Scioto County Sheriff's Office to discuss what appellant had told him, and that he worked with law enforcement to help apprehend appellant. Lennex confirmed that he collected a $200 reward for the apprehension of appellant. Lennex's brother, Joshua Lennex, also testified at trial and corroborated much of the testimony concerning the brothers' role in the apprehension of appellant.

{¶18}   Geoff Pattmore, a caseworker at the Scioto County Children Services Board, also testified at trial. Pattmore verified that several reports had been made to children services agencies in both Scioto County and in Kentucky regarding the safety of the children in appellant's and White's care. Pattmore testified that as part of his investigation into these claims

he tried to track down the bunch at the Royal Inn in late September 2016, but learned that they had moved out of the motel the day before his arrival. On that same day in September 2016, Pattmore visited an apartment complex and several businesses in Portsmouth where White had reportedly been seen panhandling, but was unable to locate White, appellant, or the children. Pattmore testified that he finally tracked down White in November 2016, at the Goodwill store in Portsmouth; but after White initially agreed to lead Pattmore to the appellant and TJ, she fled from Pattmore and was never seen by Pattmore again. Pattmore testified that before White fled, she told Pattmore that appellant was abusing her. However, on cross-examination, Pattmore stated that he did not see any bruises on White.

{¶19} Tim Wilson, retired Chief of Police of the Russell (Kentucky) Police Department also testified at trial. Wilson testified that White's aunt contacted him in July 2016 because she was concerned about TJ's safety. Wilson testified that the aunt thought White might be residing in Scioto County; so Wilson contacted the Scioto County Sheriff's Office. Wilson began working together with Jodi Conkel of the Sheriff's Office and was present for White's arrest in November 2016.

{¶20} Detective Jodi Conkel of the Scioto County Sheriff's Office also testified at trial. Detective Conkel verified that she became involved in the investigation in an official capacity on November 13, 2016. She testified that she was present for White's arrest at Gatti's Pizza on that date. Detective Conkel testified that White was advised of her Miranda rights but agreed to talk to her. Detective Conkel testified that White first told her that TJ was staying in Kentucky with a friend, but when Detective Conkel insisted White was not telling the truth, White agreed to take Detective Conkel to TJ. Detective Conkel testified that White then led her and Detective Malone to Mabert Road and told them that TJ's body was up against an abandoned house with a round

table thrown on top of it. Upon exiting the vehicle Detective Conkel could smell decomposition. Detective Conkel testified that she then found TJ's body where White said it would be located. The body was located in a plastic bag, with bones visible through an opening in the bag. Detective Conkel was then asked to interview White while other officers processed the scene. During her interview, Detective Conkel learned that TJ's deceased body was placed, for several months, in a blue and white Igloo type cooler. Detective Conkel relayed this information to officers at the scene, and a cooler matching the description was located nearby.

{¶21}   Detective Conkel also testified that she was involved in appellant's arrest. She verified that Charles Lennex had worked in conjunction with law enforcement to help apprehend appellant.

{¶22}   Detective Steve Timberlake of the Portsmouth Police Department testified consistently with the events surrounding the discovery of TJ's body on November 13, 2016. Detective Timberlake also testified about a second interview he conducted with appellant on November 20, 2016. During the second interview, a recording of which was played for the jury, appellant stated that the last time he saw TJ was when they were staying at the Royal Inn. Appellant also stated in the interview that White told him two accounts of where TJ was staying; the first being with a friend, and the second being with an aunt. Appellant also claimed during the interview that he overheard White tell someone on the phone that TJ had a seizure. Appellant denied being present when TJ died, and further claimed that he did not see his body at any time.

{¶23}   Immediately following Detective Timberlake, Detective Steve Brewer of the Portsmouth Police Department was called as a witness by the State. Detective Brewer testified that his involvement in the case was primarily as the evidence technician, and that he processed

and sent the remains of TJ's body and other evidence from the Mabert Road scenes for appropriate testing.

{¶24} Hallie Dreyer, a Forensic Scientist with the Ohio Bureau of Criminal Investigation, testified that she performed the DNA testing on the remains found at the Mabert Road residence. Dryer testified that the DNA testing verified that the remains were of a biological child of Margarita White and Michael Caudill. Dryer further testified that DNA taken from the cooler found at the neighboring Mabert Road residence was analyzed, but was insufficient for comparison to any of the parties of the case.

{¶25} Diana Cook, appellant's mother, also testified as a witness for the State. Cook testified that she first met White and TJ in the fall of 2014 or early 2015. Cook recalled visiting appellant, White, TJ, and her other grandchild (appellant and White's first biological son) in early 2015 at their home on Lincoln Road in Portsmouth. However, according to Cook, by the summer of 2016 appellant, White, and the three children[2] were homeless and living out of a truck. Cook testified that they came and visited her while they were living out of the truck in June 2016 and that TJ "had a sore on his mouth and he looked like he was in a daze. And he love popsicles. He wouldn't take the popsicle." Cook testified that after the visit she lost contact with her son, and then eventually tracked him down at the Royal Inn. Cook testified that when she visited the Royal Inn an "awful odor" was coming from appellant and White's room, and that when she asked to see the kids only White, appellant, and her two grandsons came outside. Cook asked where TJ was and White told her that he was "in Ashland with a friend." Later in the fall of 2016, Cook testified that White contacted her and asked if she would take care of the two grandchildren because they did not have a place to stay. Cook eventually agreed to take custody of the two children and she testified that they were in "horrible" condition – left with no clothes,

_____

[2] Appellant and White had a second child together by summer 2016.

no diapers, and no milk. She testified that one child had a bruise on his ear, and the other child ate food like he had been starving. She testified that appellant and TJ were not present when she met White to take custody of the two other children. On cross-examination, Cook testified that when she interacted with the children, it was primarily White who had them. When she saw appellant and the children together, they played and interacted with him and did not act scared or apprehensive.

{¶26} Mitch Waring III, the next witness called by the State, admitted to being a prior felon and drug abuser. Waring testified that he started living at 1524 Mabert Road in the fall of 2016 and that appellant, White, and their two children were already living there. Waring's girlfriend, Marie Anderson, was the renter or owner of the home. Waring testified that all of the adult occupants of the home were using drugs, specifically Suboxone and Methamphetamine. Waring further testified that he rarely saw the appellant, that he was private, and mainly stayed in the bedroom. Waring testified that while appellant was living at the home, a man named James Queen rummaged through appellant's belongings, and Waring told Queen to stop just as he uncovered a cooler. When Waring saw the cooler he immediately thought something was amiss because the cooler was covered with a tarp and sealed, airtight. Waring testified that when Queen started to remove the tarp from the cooler an "ungodly" "smell of rotten flesh, decay" overwhelmed him. Waring was unsure if Queen ever opened the cooler. Waring later questioned the smell; and it was explained to Waring that the odor of decay was from a cat; and Waring testified that he did in fact later see a half-decomposed cat near the belongings. Waring further testified that he and his girlfriend confronted White, and later appellant, about the location of their "third child"; but that appellant and White did not respond at all. Waring testified that he then put his hands on the appellant in an attempt to get a response, but that appellant pulled out a

butcher knife, threatened him, and then eventually left. White and the two children also left the residence immediately following the altercation. Waring testified that he never saw either of them again. Waring testified on cross-examination that he never noticed any bruises on White's face or neck.

{¶27} James Queen testified directly after Waring. Queen testified that he was currently serving time in prison, and that he had previously been convicted of aggravated burglary and aggravated assault. Queen also admitted that he had abused methamphetamine, Xanex, heroin, and other drugs in the past. Queen testified that he was high on methamphetamine when he rummaged through appellant's belongings at the residence on Mabert Road and smelled the rotten odor coming from the cooler. He described the smell as if something was dead. He also confirmed the dead cat story, testifying as follows:

> Yeah. For like two or three days in a row Marie [Anderson] had come to me, she
> said, "Jamie", she said, "There's a dead cat outside the back door." And I thought
> it was kind of weird because for like two or three days in a row she told me this.
> I'd go out there with a stick or something and pick up a dead kitten that was
> rotten, and I'd throw it over in the bushes back behind the other house. And then
> sure enough, the next night, there'd be another one there. I mean, that happened
> like two or three other times.

Queen confirmed on cross-examination that he never opened the cooler.

{¶28} As previously mentioned appellant's co-defendant, and TJ's mother, Margarita White, testified during the State's case. White openly admitted that she reached a plea deal with the State; requiring that she testify truthfully about what happened to TJ in exchange for a

recommended sentence of three years for child endangerment and 15 years to life for murder. White testified that she began dating appellant in early 2014, and the two moved in together in March 2014. She stated that when she first met appellant TJ did not have any serious medical concerns other than his autism. White testified at length about appellant's history with TJ. White testified that when she first started dating appellant, he and TJ got along well. However, after the appellant lost his job and started using Suboxone, she noticed a change in how appellant treated TJ. White testified that around August 2015 appellant started disciplining TJ more, making him stand in the corner for hours on end or striking him on the mouth. It was also around this time that she said appellant would no longer allow TJ's biological father or his family to see TJ anymore. White claimed that when she tried to address disciplinary matters with appellant, appellant treated TJ even worse. White testified that appellant mainly objected to TJ's potty accidents and screaming. White testified that she took TJ to the hospital on September 11, 2015, for a broken leg. White claimed that TJ fell and became injured when appellant forced him to stand on a barstool on one foot with his hands behind his back. When asked why she did not tell the doctor about the alleged barstool incident, she testified that she did not know. White further testified that she eventually told the appellant's sister about appellant's involvement in TJ's broken leg, but never confided in anyone else. White went on to make further serious accusations against appellant, including an allegation that appellant stuffed socks in TJ's mouth, and smeared feces in TJ's mouth following bathroom accidents. She also stated that by spring 2016, when they were living with her mom and stepfather in South Shore, Kentucky, TJ was losing weight and appellant "would go off and on with letting [TJ] eat" and "if TJ peed himself, he'd keep liquids from him."

{¶29} White also testified about her relationship with appellant, including multiple instances where appellant allegedly beat her and choked her until she blacked out. Specifically, White testified that appellant would "pin [her] down and beat [her] for hours." White stated that these alleged incidents led to a fallout between her and her parents, especially after her stepfather saw TJ with a sock in his mouth. White left with appellant on June 5, 2016, rather than stay with her parents. Shortly thereafter, appellant, White, TJ, and their two other children lived out of a truck/camper in Portsmouth. During this time TJ was being fed "[o]ff and on" and TJ developed a bedsore because appellant would not allow him out of the truck.

{¶30} White testified that she resorted to panhandling for the purpose of obtaining money for food and drugs. She claimed that during this time, around July or August of 2016, TJ was barely being fed, was not receiving liquids, and was forced to stay in the shower of the camper at all times. When TJ was given juice, White claimed that it ran straight through him and was causing extreme diarrhea. White testified that she did not take TJ to the hospital because appellant told her they would end up in trouble. Eventually, they all moved to the Royal Inn on August 10, 2016; and White testified that appellant continued to abuse TJ: picking up, squeezing, and yanking him by the arm. White testified that on the last day she saw TJ alive, August 23, she left him in appellant's care at the Royal Inn while she panhandled for money. She described TJ's appearance that day as similar to a "holocaust victim", "like the pictures you would see in the books." She testified that when she returned she found TJ laying in the corner deceased, and appellant told her he might have had a seizure. However, White testified that she thinks TJ died because he was malnourished. When asked why she did not seek help for TJ, White responded, "I don't know." Neither appellant nor White tried to resuscitate TJ or call 911, because the child was blue and swollen when they discovered him laying in the corner. White claimed that she was

going to leave appellant and go to a battered woman's shelter; but it was already too late as that occurred on the same day that TJ died.

{¶31}   White testified that upon discovering that TJ had died, appellant directed her to get ice from the hotel ice machine. According to White, appellant then locked her and the other two children out of the room while he placed TJ's body in a cooler and washed a comforter that had been used to cover TJ's body. White testified that when the appellant let her back into the room "he had a smile on his face like – like everything was okay." White testified that they let the cooler with TJ's body sit in the bathroom of the hotel room from August 23, 2016, until September 22, 2016, when they moved out of the hotel. White stated that they went from the hotel to Marie Anderson's house on Mabert Road because the police and child protection services had showed up at the Royal Inn the last day they were there. White testified that appellant then placed the cooler and everything else they owned out back behind Marie Anderson's house. She stated that he placed two garbage bags over the cooler and sprayed perfume because the smell was so bad. White testified that she still called no one at that time because "she was scared of getting in trouble. I was scared of him. I was scared of him trying to run with one of the other kids." She also testified that she believed that appellant was killing cats and placing them out back to mask the decomposition smell. White testified further that appellant eventually removed the body and cleaned out the cooler when the other occupants of the home began questioning the smell. After the police showed up to the Mabert Road residence looking for White, White testified that she and appellant gave their other two kids to appellant's mother, and she and appellant began sleeping in the woods and at the residence of one of appellant's ex-girlfriends. She claimed that appellant told her to tell people that TJ was in Ashland, Kentucky, with a friend if they asked; and if they found the body, to tell law

enforcement that he was not involved, that he was not there and that it was her fault and that she had hid the body on her own. White testified that she knew where the body was because appellant had told her that it was around the abandoned house on Mabert under a tabletop.

{¶32} White testified that she continued to correspond with appellant even after they were arrested. The two wrote letters while in jail; and White even testified that on one occasion she and the appellant had sex while they were at the Scioto County Jail.

{¶33} On cross-examination, White conceded that she had a chance to get away and save TJ when she took him to the hospital for his broken leg. White further testified on cross-examination that she could have removed herself and the children from appellant in June 2015, when appellant was arrested on an unrelated matter. White also testified on cross-examination that she refused any help from her parents, despite her parent's willingness and eagerness to remove appellant from her life. She also testified about other instances where she could have reported the abuse but did not. Finally, on cross-examination, White again testified that she had entered into a plea deal with the State, in which she pleaded guilty to the murder of her son, TJ. As part of the plea deal, White confirmed that she agreed to testify against appellant.

{¶34} The State's final witness was Dr. Lee Lehman, the Chief Deputy Coroner at the Montgomery County Coroner's Office. Dr. Lehman was designated as an expert and opined that the autopsy of TJ's remains revealed evidence of abuse and neglect. Specifically, Dr. Lehman noted eight fractures of the ribs and arms, which he opined was typical fractures associated with child abuse. Dr. Lehman further testified that there was evidence of malnourishment in the Harris lines across TJ's bones. He also testified that there was noticeable bone growth delay, which is evidence that TJ was not getting proper nutrition. Based on the "totality of the injuries, and all the information that indicates that there was abuse and neglect", Dr. Lehman opined that abuse

and neglect caused TJ's death. On cross-examination, Dr. Lehman could not approximate the time frame when malnourishment first began.

{¶35} As previously stated, appellant rested without testifying or calling any witnesses on his behalf.

{¶36} On September 8, 2017, the jury found appellant guilty of all counts of the indictment. At sentencing, certain counts were merged; and appellant was ultimately sentenced to an aggregate prison term of life without the possibility of parole, plus 11 years.

{¶37} Appellant filed a timely notice of appeal.

## II. Assignments of Error

{¶38} On appeal, appellant assigns the following errors for our review:

Assignment of Error I:

> Defendant's Convictions for (A) Aggravated Murder, (B) Murder, (C) Child Endangering, (D) Tampering With Evidence, And (E) Gross Abuse Of A Corpse Were Against The Manifest Weight And Sufficiency Of The Evidence.

Assignment of Error II:

> The Trial Court abused its discretion when it denied Defendant's Motion for a Continuance of the Jury Trial.

Assignment of Error III:

> The Trial Court abused its discretion when it limited the cross examination of Appellant's Co-Defendant Margarita White.

Assignment of Error IV:

> The Trial Court abused its discretion and committed plain error when it failed to give the appropriate jury instruction regarding co-defendant testimony.

Assignment of Error V:

> Appellant's Counsel was ineffective for **(a)** failing to object to improper opinion testimony, **(b)** failing to request a proper jury instruction on co-defendant

testimony, **(c)** failing to object to prior bad acts evidence, and **(d)** failing to object to the prosecutor's improper comments during closing.

Assignment of Error VI:

There were improper comments made by the prosecutor in its closing argument.

Assignment of Error VII:

The Court abused its discretion in failing to order a jury view of the scene.

Assignment of Error VIII:

The Trial Court abused its discretion in admitting improper hearsay evidence from Mitch Waring.

Assignment of Error IX:

Cumulative errors committed during Appellant's trial deprived him of a fair trial and require reversal of his convictions.

### III. Law and Analysis

{¶39} For ease of analysis, we will address appellant's assignments of error out of order.

## A. The Trial Court Did Not Abuse Its Discretion in Denying the Motion for Continuance of Jury Trial

{¶40} In his second assignment of error, appellant contends that the trial court abused its discretion when it denied his motion for continuance of the jury trial. Appellant asserts that a continuance was necessary because his co-defendant, White, took a plea deal and agreed to testify against him a week before scheduled trial. He asserts that White was the State's key witness, and without a continuance, his trial counsel was unable to properly prepare his defense, thus depriving him of a fair trial.

{¶41} "The grant or denial of a continuance is a matter entrusted to the sound discretion of the trial court." *In re Fortney*, 162 Ohio App.3d 170, 2005-Ohio-3618, 832 N.E.2d 1257, ¶ 59

(4th Dist.), citing *State v. Unger*, 67 Ohio St.2d 65, 423 N.E.2d 1078 (1981), syllabus.

"Appellate courts may not disturb a trial court's decision to deny a continuance absent an abuse

of discretion." *Id*., citing *Unger* at 67. An abuse of discretion implies that the court's attitude is

unreasonable, arbitrary, or unconscionable. *Id*. "Whether a trial court abused its discretion in

denying a continuance depends upon the facts and circumstances of each case, 'particularly in

reasons presented to the trial judge at the time the request is denied.' " *Id*., quoting *Unger* at 67.

{¶42}  In considering a motion for continuance, "[a] trial court must weigh 'any potential

prejudice to a defendant' against 'concerns such as a court's right to control its own docket and

the public's interest in the prompt and efficient dispatch of justice.' " *Id.* at ¶ 60, quoting *Unger*

at 67. Specifically:

> "In evaluating a motion for continuance, a court should note, inter alia: the length
>
> of the delay requested; whether other continuances have been requested and
>
> received; the inconvenience to litigants, witnesses, opposing counsel and the
>
> court; whether the requested delay is for legitimate reasons or whether it is
>
> dilatory, purposeful, or contrived; whether the defendant contributed to the
>
> circumstance which gives rise to the request for a continuance; and other relevant
>
> factors, depending on the unique facts of each case."

*Id*., quoting *Unger* at 67-68.

{¶43}  As previously stated, appellant requested a continuance of his jury trial on August

28, 2017. Appellant's motion claimed that the recent plea deal struck by White along with her

disclosure as a witness against him had significantly altered his trial strategy and as such he

would need additional time to prepare for trial. Appellant's request was denied by entry of the

trial court the following day. The trial court, aside from stating that the motion was not well taken, gave no reasoning in its denial. White was then officially disclosed as a witness by the State in a supplemental discovery request on August 31, 2017; and appellant's trial commenced on September 5, 2017, as scheduled.

{¶44}  Here, White was charged as a co-defendant from the inception of this case. Thus, appellant and his counsel knew or should have known that White had the potential of entering a negotiated plea agreement that could result in her testimony against him. Moreover, appellant became aware of the terms of White's plea agreement more than a week prior to the commencement of his trial and had adequate time to formulate a defense strategy. In short, we do not believe that appellant was surprised or blindsided by the revelation that White would testify against him; or that he had inadequate time to respond to the development. Thus, in weighing any potential prejudice to appellant against the court's right to control its own docket and the public's interest in the prompt and efficient dispatch of justice, we conclude that the trial court acted within its discretion when it denied the motion. Accordingly, appellant's second assignment of error is overruled.

## B. The Trial Court Did Not Abuse Its Discretion by Failing to Order a Jury View of the Scene

{¶45}  In his seventh assignment of error, appellant contends that the trial court abused its discretion by failing to order a jury view of the scene at 1522 Mabert Road and 1524 Mabert Road. He contends that a jury view of the scene was essential to his "constitutional right to effectively confront the State's case and to ensure receipt of effective assistance of counsel"; and to assist the jury with its understanding of the facts presented at trial.

{¶46}   Prior to trial, appellant filed a motion for a jury view of the scene at 1522 Mabert Road, Portsmouth, Ohio, and 1524 Mabert Road, Portsmouth, Ohio. The trial court denied the motion at the commencement of trial, with the caveat that if it became necessary as the evidence was presented, it would reconsider the motion. Ultimately, the issue of a jury view was never revisited.

{¶47}   The purpose of a jury view of the property is not evidentiary but rather to give the jury a chance to apply the evidence offered at trial. *See generally* 42 Ohio Jurisprudence 3d, Evidence and Witnesses, Section 8, at 216 (1983). "The grant or denial of a jury view is within the sound discretion of the trial court"; and "[t]he decision of the trial court will not be reversed absent an abuse of discretion." *State v. Taylor*, 4th Dist. Adams No. 95CA601, 1996 WL 205593, *2 (Apr. 24, 1996). As discussed above, the term "abuse of discretion" implies that the trial court's ruling was unreasonable, arbitrary, or unconscionable. *Id*.

{¶48}   "There are no particular requirements as to when the trial court should grant a jury view." *Id*. However, R.C. 2945.16 states:

> When it is proper for the jurors to have a view of the place at which a material
> fact occurred, the trial court may order them to be conducted in a body, under the
> charge of the sheriff or other officer, to such place, which shall be shown to them
> by a person designated by the court. * * *

"Thus, the facts of each case determine whether the court abused its discretion." *Taylor* at *2.

{¶49}   Here, there is nothing in the record to support appellant's assertion that the trial court acted unreasonably, unconscionably, or arbitrarily in denying the jury view. At trial, several photographs of 1522 Mabert Road, where TJ's body was located, were presented to the jury and admitted as evidence. Moreover, photographs of the remains of TJ's body as they were

found under the tabletop at 1522 Mabert Road were presented and admitted. Even a photograph

of the area behind 1524 Mabert Road, where the cooler was located, was presented to the jury

and admitted as evidence. Appellant did not question at trial whether the photographs were

accurate representations of the properties, and did not renew its request to view the residences.

Furthermore, the witnesses described the scene during the trial. Given these facts, we believe that

the trial court's decision to deny a jury view was not unreasonable, arbitrary, or unconscionable.

Accordingly, appellant's seventh assignment of error is overruled.

### C. The Trial Court Did Not Abuse Its Discretion in Limiting the Scope of Cross-Examination of the Co-Defendant White

{¶50}  In his third assignment of error, appellant contends that the trial court abused its

discretion when it limited the cross-examination of his co-defendant, Margarita White.

{¶51}  During cross-examination of White, numerous questions were asked about

White's involvement in TJ's death; and the plea deal that she struck with the State. White

testified that she was originally charged with the same crimes that appellant was charged with;

but that she only agreed to plea guilty to child endangering and murder. When asked if she killed

her son, White testified that she did not, but she did admit to "turning [her] head to what

[appellant] was doing." Defense counsel continued to press White on the issue, and the following

exchange occurred:

> Q.     And you've admitted to pleading guilty to murder of your own child;
> correct?

> A.     I turned a blind eye –child endangering.

> Q.     Not what I asked you.

A.      Which caused in the murder of my son, but I did not

Q.      Did you –did you-- * * *

A.      I did not –

[Assistant Prosecutor]: Your Honor, I object. * * *

THE COURT: Sustained. You may answer the question.

[Defense Counsel]: She's not answering the question, Your Honor. That's not what I asked. I asked if she pleaded guilty to murdering her own child and –

THE COURT: And that's been gone over about six times now. Okay. Let's move on.

{¶52}  Appellant contends that the trial court's restriction on the cross-examination of White violated his constitutional right of confrontation. Specifically, he submits that his theme throughout trial was that White directly caused the death of her child and was the sole party responsible, and when the trial court limited his cross-examination, it compromised his theme and interfered with his attempt to destroy her credibility.

{¶53}  The Sixth Amendment to the United States Constitution gives a defendant the right "to be confronted with the witnesses against him." *See also* Section 10, Article I of the Ohio Constitution ("the party accused shall be allowed * * * to meet the witnesses face to face"). But this protection "guarantees only 'an *opportunity* for effective cross-examination[.]' " (Emphasis in original.) *State v. Lang,* 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 83, quoting *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985). Trial courts have "wide latitude * * * to impose reasonable limits on such cross-

examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). "An appellate court will not interfere with a trial court's decision regarding the scope of cross-examination absent an abuse of discretion." *State v. Leasure*, 2015-Ohio-5327, 43 N.E.3d 477, ¶ 44 (4th Dist.), citing *State v. Handa,* 4th Dist. Athens No. 07CA26, 2008-Ohio-3754, ¶ 19.

{¶54} Here, immediately prior to the contested inquiry, White admitted that she pleaded guilty to murder: "I pled to murder, not the aggravated murder. * * * Yes, sir." Furthermore, during her direct testimony she acknowledged that she faces 15 years to life in prison "for murder". Thus, it is clear that White answered the question of whether she pleaded guilty to murder on both direct and cross-examination and appellant's confrontation rights were not violated. Requiring White to answer the question again would have minimal impact and would result in harassment of the witness and repetitive testimony. Thus, the trial court did not abuse its discretion in limiting cross-examination on this issue. Accordingly, appellant's third assignment of error is overruled.

## D. The Trial Court Did Not Err in Overruling Appellant's Hearsay Objection

{¶55} In his eighth assignment of error, appellant contends that the trial court erred in admitting improper hearsay evidence during Mitch Waring's testimony. In particular, appellant takes issue with Waring's testimony that Marie Anderson, after an encounter with law enforcement, asked White "where's your third kid, where's your kid at, you're supposed to have three kids." Appellant also takes issue with Waring's testimony, that during the same encounter, Anderson screamed at White, saying "don't leave your two kids for this man. You're going to chase a man and leave your other two kids here." Defense counsel objected to the statements but

was overruled by the trial court. The State, both in the trial proceedings, and now on appeal, argues that the statements are admissible excited utterances.

{¶56} As discussed in the previous assignment of error, the Sixth Amendment to the United States Constitution provides, "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." Likewise, Section 10, Article I of the Ohio Constitution provides, "[i]n any trial, in any court, the party accused shall be allowed * * * to meet the witnesses face to face." The Supreme Court of the United States has held that evidence that is "testimonial hearsay" offends a defendant's Sixth Amendment right to confrontation and is not admissible. *Crawford v. Washington,* 541 U.S. 36, 51, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

{¶57} " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). "Hearsay is not admissible except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio." Evid.R. 802. The exception relevant in the case sub judice is Evid.R. 803(2), the excited-utterance exception, which provides that "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is not excluded by the hearsay rule.

{¶58} Ohio courts apply the following four-part test to determine the admissibility of statements as an excited utterance:

"(a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties

and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement of declaration spontaneous and unreflective,

 (b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties so that such domination *continued* to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs,

(c) that the statement or declaration related to such startling occurrence or the circumstances of such starling occurrence, and

(d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration."

(Emphasis in original.) *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 166, quoting *Potter v. Baker*, 162 Ohio St. 488, 124 N.E.2d 140 (1955), paragraph two of the syllabus. *Accord State v. Felts*, 2016-Ohio-2755, 52 N.E.3d 1223, ¶¶ 52-53 (4th Dist.). "The rationale of the rule is that circumstances surrounding the excited statement prevent the declarant from using reflective processes to fabricate a statement." *Felts* at ¶ 53.

{¶59}  Here, the statements at issue were immediately preceded by a startling event. Waring testified that immediately before the statements at issue were made, police had arrived to the house on Mabert Road looking for White, appellant, and the "three" children. Waring, Anderson, White, and appellant were all at the house at the time, but only Anderson spoke to the police on the porch while the rest remained hidden inside. After the police left Waring testified

that everyone was excited and "[g]etting goose bumps" because they had never seen a third child with White and appellant since they had been staying at the house. According to Waring, things were getting "very hot" and intense, and even physical, because of the revelation of the third child. Thus, there is no dispute that a startling event occurred. Furthermore, Anderson's statements were made contemporaneously with the startling event, and obviously were made while under the stress of the excitement caused by the police's revelation that White and appellant were supposed to have three children under their care. Waring testified that Anderson was "going off" on White and appellant, "shouting", "hollering", "screaming" and "drilling" them on the location of the third child. Finally, the statements at issue clearly related to the startling event, and Anderson, who talked to the police and who lived with White and appellant in the house on Mabert Road, had firsthand knowledge of the circumstances.

{¶60} Accordingly, there is no dispute that the requirements for the application of the excited-utterance exception exist here; and thus, the trial court did not err in overruling appellant's hearsay objection. Appellant's eighth assignment of error is overruled.

### E. The Prosecuting Attorney Did Not Engage in Prosecutorial Misconduct

{¶61} In his sixth assignment of error, appellant contends that the prosecuting attorney made improper remarks in rebuttal closing argument that resulted in prosecutorial misconduct. Thus, he argues that his convictions should be reversed. Notably, appellant did not object to the remarks during the trial proceedings.

{¶62} This Court previously set forth in *Wellston v. Horsley,* 4th Dist. Jackson No. 05CA18, 2006-Ohio-4386, the standard that applies when evaluating claims that the prosecutor engaged in misconduct by improperly commenting in closing argument. In that case we stated the following:

The Supreme Court of Ohio has admonished us that prosecutorial

misconduct constitutes reversible error only in " 'rare instances.' " *State v.*

*Keenan* (1993), 66 Ohio St.3d 402, 405, 613 N.E.2d 203, quoting *State v.*

*DePew* (1988), 38 Ohio St.3d 275, 288, 528 N.E.2d 542. "The test

for prosecutorial misconduct is whether the conduct complained of deprived the

defendant of a fair trial." *State v. Jackson* (2001), 92 Ohio St.3d 436, 441, 751

N.E.2d 946. "The test for prejudice regarding prosecutorial misconduct * * * is '

"whether the remarks were improper and, if so, whether they prejudicially

affected substantial rights of the defendant." ' " *State v. Hartman* (2001), 93 Ohio

St.3d 274, 295, 754 N.E.2d 1150 (quoting *State v. Hessler* (2000), 90 Ohio St.3d

108, 125, 734 N.E.2d 1237 and *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 470

N.E.2d 883). To establish prejudice, an accused must show that a reasonable

probability exists that, but for the prosecutor's improper remarks, the result of the

proceeding would have been different. *State v. Loza* (1994), 71 Ohio St.3d 61, 83,

641 N.E.2d 1082. An appellate court must examine the prosecution's closing

argument in its entirety to determine whether the remarks prejudiced the

defendant. *State v. Treesh* (2001), 90 Ohio St.3d 460, 466, 739 N.E.2d 749; *State*

*v. Keenan* (1993), 66 Ohio St.3d 402, 410, 613 N.E.2d 203. It amounts to a de

novo independent review.

During closing arguments, the prosecution is given wide latitude to

convincingly advance its strongest arguments and positions. See *State v.*

*Phillips* (1995), 74 Ohio St.3d 72, 90, 656 N.E.2d 643; *Treesh,* 90 Ohio St.3d at

466 [739 N.E.2d 749]. Nevertheless, the prosecutor must avoid going beyond the

evidence presented to the jury in order to obtain a conviction. See, e.g., *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883. "[P]rosecutors must be diligent in their efforts to stay within the boundaries of acceptable argument and must refrain from the desire to make outlandish remarks, misstate evidence, or confuse legal concepts." *State v. Fears* (1999), 86 Ohio St.3d 329, 332, 715 N.E.2d 136.

When in a case like this, a defendant fails to object to the prosecutor's alleged misconduct, he waives all but plain error.[3] See Crim.R. 52; *State v. Hartman* (2001), 93 Ohio St.3d 274, 294, 754 N.E.2d 1150; *State v. Ballew* (1996), 76 Ohio St.3d 244, 254, 667 N.E.2d 369. Notice of plain error under Crim.R. 52(B) is to be taken with the utmost of caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. See, e.g., *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240; *State v. Hill* (2001), 92 Ohio St.3d 191, 196, 749 N.E.2d 274. Plain error should not be invoked unless it can be said that, but for the error, the outcome of the trial would clearly have been otherwise. See, e.g., *State v. Jackson* (2001), 92 Ohio St.3d 436, 438, 751 N.E.2d 946; *State v. Sanders* (2001), 92 Ohio St.3d 245, 263, 750 N.E.2d 90.

*Horsley* at ¶¶ 20-22. *Accord State v. Minton*, 2016-Ohio-5427, 69 N.E.3d 1108, ¶ 56 (4th Dist.).

{¶63}   Here, appellant claims that the following statement, made by the prosecutor during rebuttal closing argument, implies that he should have taken responsibility for TJ's death:

---

[3] Appellant, like the defendant in *Horsley*, did not object at trial to the alleged misconduct.

In this videos (sic) did he ever once stand up and take it like a man? Listen, I'm in charge

out there. I'm the one that's -- took her to the doctor -- took him to the doctor. I'm the

one that did this. I'm the one that potty trained him. Stand up and take it like a man.

Appellant further claims that the statement implies that he should have given up his right to

remain silent, and that the remarks deprived him of his right to a fair trial.

{¶64}  After reviewing the prosecutor's remarks during closing arguments, we do not

find that the remarks were improper. When read in proper context, it is clear that the prosecutor

was responding to appellant's closing argument, in which he advanced a theory that White was

"the monster", and should be solely responsible for TJ's death and only testified to "save her

own neck". The language used by the prosecutor was not intended to be a comment on

appellant's failure to admit to the crime, but rather, was meant to dispute appellant's version of

events. Furthermore, appellant's interviews with law enforcement were played for the jury; and

the prosecutor could fairly comment on the content of those interviews. We do not believe that

such remarks are improper, or go beyond the bounds of acceptable argument. Moreover, the

comments do not constitute a penalty on appellant's decision to exercise his constitutional right

to trial or right to remain silent.

{¶65}  Accordingly, we find no merit to appellant's arguments, and overrule his sixth

assignment of error.

**F. The Trial Court Did Not Commit Plain Error When It Failed to Include the Accomplice**

**Jury Instruction – R.C. 2923.03(D)**

{¶66}  In his fourth assignment of error, appellant contends that the trial court committed

plain error when it failed to include a jury instruction regarding the testimony of an accomplice.

{¶67}  Appellant's trial counsel did not object or raise the issue of the accomplice jury instruction at trial. When a defendant fails to object to erroneous jury instructions, our review is limited to whether the instructions amounted to plain error. *State v. Steele,* 138 Ohio St.3d 1, 2013–Ohio–2470, 3 N.E.3d 135, ¶ 29; *State v. Mockbee,* 2013–Ohio–5504, 5 N.E.3d 50, ¶ 24 (4th Dist.); Crim.R. 52(B). "To constitute plain error, a reviewing court must find (1) an error in the proceedings, (2) the error must be a plain, obvious or clear defect in the trial proceedings, and (3) the error must have affected 'substantial rights' (i.e., the trial court's error must have affected the trial's outcome)." *State v. Dickess,* 174 Ohio App.3d 658, 2008–Ohio–39, 884 N.E.2d 92, ¶ 31 (4th Dist.), citing *State v. Hill,* 92 Ohio St.3d 191, 749 N.E.2d 274 (2001), and *State v. Barnes,* 94 Ohio St.3d 21, 27, 2002–Ohio–68, 759 N.E.2d 1240. "Furthermore, notice of plain error must be taken with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice." *Id.,* citing *State v. Landrum,* 53 Ohio St.3d 107, 111, 559 N.E.2d 710 (1990), and *State v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. "A reviewing court should notice plain error only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id. Accord State v. Lewis*, 4th Dist. Ross No. 14CA3467, 2015-Ohio-4303, ¶ 9.

{¶68}  R.C. 2923.03(D) states the following with respect to accomplice testimony:

> If an alleged accomplice of the defendant testifies against the defendant in a case in which the defendant is charged with complicity in the commission of or an attempt to commit an offense, an attempt to commit an offense, or an offense, the court, when it charges the jury, shall state substantially the following:
>
> "The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed

complicity of a witness may affect his credibility and make his testimony subject

to grave suspicion, and require that it be weighed with great caution.

It is for you, as jurors, in the light of all the facts presented to you from the

witness stand, to evaluate such testimony and to determine its quality and worth

or its lack of quality and worth."

{¶69} Here, it is undisputed that White and appellant were accomplices. It is also

undisputed that the trial court did not give the accomplice jury instruction pursuant to R.C.

2923.03(D). " 'Ohio courts generally look to three factors to determine whether a trial court's

failure to give the accomplice instruction constitutes plain error: (1) whether the accomplice's

testimony was corroborated by other evidence introduced at trial; (2) whether the jury was aware

from the accomplice's testimony that [he/she] benefited from agreeing to testify against the

defendant; and/or (3) whether the jury was instructed generally regarding its duty to evaluate the

credibility of the witnesses and its province to determine what testimony is worthy of belief.'

" *State v. Bentley,* 11th Dist. Portage No.2004–P–0053, 2005–Ohio–4648, ¶ 58, quoting *State v.*

*Woodson,* 10th Dist. Franklin No. 03AP–736, 2004–Ohio–5713, ¶ 18. *Accord Lewis* at ¶ 11.

{¶70} On the facts before us, we are not persuaded that the trial court's failure to include

the R.C. 2923.03(D) jury instruction amounts to plain error. First, White testified openly about

the plea bargain she received from the State in exchange for her testimony against the appellant.

Therefore, the jury was well aware of White's motivations for testifying. Next, the trial court did

give a general jury instruction on the creditability of witnesses and its province to determine

what testimony is worthy of belief. Finally, other evidence introduced at trial corroborated a

majority of White's testimony. Therefore, because all the factors of the *Woodson* test are

satisfied, appellant has not shown that, but for the trial court's failure to give the required jury instruction, the outcome of the trial would clearly have been different.

{¶71} Accordingly, appellant has not shown plain error, and appellant's fourth assignment of error is overruled.

## G. The Murder Conviction is Supported By Sufficient Evidence and the Other Convictions are Not Against the Manifest Weight of the Evidence

{¶72} In his first assignment of error, appellant contends that his convictions are supported by insufficient evidence, or alternatively, are against the manifest weight of the evidence. He essentially argues that the State's witnesses, especially White, are not credible, and without their testimony, no evidence exists that he had any involvement or knowledge of what happened to TJ.

{¶73} Whether a conviction is supported by sufficient evidence is a question of law that we review de novo. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997); *State v. Allah*, 4th Dist. Gallia No. 14CA12, 2015–Ohio–5060, ¶ 8. In making this determination, we must determine whether the evidence adduced at the trial, if believed, reasonably could support a finding of guilt beyond a reasonable doubt. *State v. Davis,* 4th Dist. Ross No. 12CA3336, 2013–Ohio–1504, ¶ 12. "The standard of review is whether, after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt." *Id.,* citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶74} In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable

inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *Thompkins* at 387; *State v. Hunter,* 131 Ohio St.3d 67, 2011–Ohio–6524, 960 N.E.2d 955, ¶ 119. "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence." *Thompkins* at 387. But the weight and credibility of evidence are to be determined by the trier of fact. *State v. West*, 4th Dist. Scioto No. 12CA3507, 2014–Ohio–1941, ¶ 23. A trier of fact "is free to believe all, part or none of the testimony of any witness who appears before it." *Id*. We defer to the trier of fact on these evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility. *Id.*

{¶75} Appellant contends that his conviction for murder is based on insufficient evidence because White is not credible and without her testimony, no evidence exists that would support actual participation by appellant in TJ's death. "Questions of witness credibility are irrelevant to the issue of whether there is sufficient evidence to support a conviction, however." *State v. Ruark*, 10th Dist. Franklin No. 10AP-50, 2011-Ohio-2225, ¶ 21, citing *State v. Preston-Glenn*, 10th Dist. Franklin No. 09AP-92, 2009-Ohio-6771, ¶ 38. "In determining whether a conviction is based on sufficient evidence, we do not address whether the evidence is to be believed, but whether, if believed, the evidence against defendant would support a conviction." *Id*., citing *State v. Smith*, 10th Dist. Franklin No. 08AP-736, 2009-Ohio-2166, ¶ 26, *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, and *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79.

{¶76} White's testimony, if believed, is sufficient to support appellant's murder conviction. White testified that TJ was in her and the appellant's care prior to his death. White further testified that appellant extensively abused both her and TJ, and withheld food and drink from TJ. Based on this evidence, a jury could reasonably conclude that appellant's actions, inactions, and manipulative and abusive control of White and TJ caused the death of TJ through abuse, neglect, and malnourishment. Thus, appellant's murder conviction is indeed supported by sufficient evidence.

{¶77} Appellant argues that his remaining convictions for aggravated murder, child endangering, tampering with evidence, and gross abuse of a corpse are against the manifest weight of the evidence because of the "credibility issues" of the witnesses – particularly White. He argues that the witnesses' credibility has been destroyed due to their personal and criminal histories - and in the case of White, her incredible explanation of events that "def[ies] explanation" - and thus could not be relied upon by the jury. "However, * * * a conviction is not against the manifest weight of the evidence simply because the jury believed the prosecution testimony. * * * [A]s the trier of fact, the jury was free to believe or disbelieve all, part, or none of the testimony of the witnesses presented at trial." (Citations omitted.) *State v. Erickson*, 12th Dist. Warren No. CA2014-10-131, 2015-Ohio-2086, ¶ 42.

{¶78} The jury apparently believed all or part of White's testimony that appellant perpetrated abuse and neglect against TJ that ultimately resulted in his death; and they were free to do so. *State v. Shirley*, 4th Dist. Ross No. 16CA3562, 2017-Ohio-1520, ¶ 23. They also apparently believed the testimony of the State's other witnesses whose testimony bolstered and corroborated much of the evidence presented through White. The jury was able to observe the witnesses on the witness stand, and was in the best position to judge and weigh the credibility of

the witnesses. Put simply, the jury had before it sufficient facts to ascertain the witnesses' credibility and to weigh it accordingly, and we will not substitute our judgment for that of the jury.

{¶79}   After a thorough review of the record, we cannot say that this is an exceptional case where the evidence weighs heavily in favor of appellant and where it is clear that the jury lost its way or created a manifest miscarriage of justice.

{¶80}   Accordingly, having concluded that appellant's murder conviction is supported by sufficient evidence, and that his remaining convictions are not against the manifest weight of the evidence, we overrule appellant's first assignment of error.

### H. Appellant was Not Deprived of the Effective Assistance of Counsel

{¶81}   In his fifth assignment of error, appellant alleges numerous instances where his counsel performed deficiently, and argues that the prejudicial effect of the errors deprived him of his right to the effective assistance of counsel.

{¶82}   To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *State v. Short*, 129 Ohio St.3d 360, 2011–Ohio–3641, 952 N.E.2d 1121, ¶ 113; *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Failure to satisfy either part of the test is fatal to the claim. *Strickland* at 697; *State v. Bradley*, 42 Ohio St.3d 136, 143, 538 N.E.2d 373 (1989). "Because this issue cannot be presented at trial, we conduct the initial review." *State v. Plymale*, 4th Dist. Gallia No. 15CA1, 2016–Ohio–3340, ¶ 34.

{¶83}  The defendant has the burden of proof because in Ohio, a properly licensed attorney is presumed competent. *State v. Gondor*, 112 Ohio St.3d 377, 2006–Ohio–6679, 860 N.E.2d 77, ¶ 62. In reviewing the claim of ineffective assistance of counsel, we must indulge in "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Quotations omitted.) *Strickland* at 689. Therefore, a defendant bears the burden to show ineffectiveness by demonstrating that counsel's errors were so serious that he or she failed to function as the counsel guaranteed by the Sixth Amendment. *Gondor* at ¶ 61.

{¶84}  Appellant first contends that his trial counsel acted deficiently because he failed to object to the opinion testimony of the coroner, Dr. Lehman, or to the admission of Lehman's autopsy report. Appellant notes that attached to the autopsy report is a report from Dr. Elizabeth Murray, a forensic anthropologist consulted by Dr. Lehman. Dr. Murray did not testify at trial, and Murray's report includes a questionnaire that was circulated to a number of unnamed colleagues. The answers provided by these unnamed colleagues were attached to the autopsy report and allowed to be seen by the jury. Appellants submits that his trial counsel was ineffective because he should have (1) objected to the opinion testimony of Dr. Lehman as it was based on the opinions of numerous other individuals, and (2) objected to the admission of the autopsy report due to inadmissible hearsay.

{¶85}  We conclude that appellant's trial counsel did not perform deficiently when it failed to object to Dr. Lehman's testimony or to the admission of the autopsy report. "[A]n autopsy report [prepared by a nontestifying medical examiner] that is neither prepared for the primary purpose of accusing a targeted individual nor prepared for the primary purpose of

providing evidence in a criminal trial is nontestimonial, and its admission into evidence at trial under Evid.R. 803(6) as a business record does not violate a defendant's Sixth Amendment confrontation rights." *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 63; *see also State v. Adams*, 146 Ohio St.3d 232, 2016-Ohio-3043, 54 N.E.3d 1227, ¶ 4. Furthermore, additional reports used as aids to help the coroner determine the cause of death and that are neither prepared for the primary purpose of accusing a targeted individual or prepared for the primary purpose of providing evidence in a criminal trial are nontestimonial and admissible into evidence at trial. *State v. Crane*, 2014-Ohio-3657, 17 N.E.3d 1252, ¶ 51 (12th Dist.). Finally, because the reports are admissible, Dr. Lehman's testimony about the contents of the reports and his ultimate opinion are also admissible and do not violate appellant's constitutional rights. *Adams* at ¶ 6, citing *Maxwell* at ¶¶ 51-52. Based on this precedent, we hold that the failure to challenge Dr. Lehman's testimony or the admissibility of the autopsy report was not ineffective representation, because any such challenge would have failed as a matter of law.

{¶86}  Next, appellant asserts that his trial counsel's failure to request the jury instruction set forth in R.C. 2923.03(D), and his failure to object to its omission in the court's charge amounts to ineffective assistance. We disagree. Because we found in appellant's fourth assignment of error that the court's failure to give the jury instruction provided for in R.C. 2923.03(D) does not rise to the level of plain error, we find that counsel's failure to request the same instruction fails to meet the prejudice prong of the *Strickland* test. Accordingly, we do not find that appellant's counsel was ineffective in this regard. *Accord State v. Johnson*, 4th Dist. Vinton No. 06CA650, 2007-Ohio-2176, ¶ 53; *State v. West*, 4th Dist. Scioto No. 12CA3507, 2014-Ohio-1941, ¶ 20.

{¶87}   Appellant's third claim of ineffective assistance of counsel is based upon his trial counsel's failure to object to prior bad acts evidence presented by the State. Specifically, appellant claims that his counsel should have objected to White's testimony that appellant regularly beat and choked her, and abused the other two children under his care.

{¶88}   We initially note that appellant's claim that the State failed to file a notice of intention to use other acts evidence is inaccurate. In fact, the State filed such notice on August 30, 2017; revealing that it intended to introduce evidence of other acts such as drug abuse and a pattern of abusive behavior towards children.

{¶89}   "A trial court has broad discretion in the admission or exclusion of evidence, and so long as such discretion is exercised in line with the rules of procedure and evidence, its judgment will not be reversed absent a clear showing of an abuse of discretion with attendant material prejudice to defendant." *State v. Dunham*, 4th Dist. Scioto No. 04CA2931, 2005-Ohio-3642, ¶ 28.

{¶90}   Evid.R. 404(B) states "[e]vidnce of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." However, such evidence "may * * * be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id*. "Thus, while evidence of other crimes, wrongs or acts committed by the accused is not admissible to show that the accused has a propensity to commit crimes, it may be relevant to show: motive, intent, absence of a mistake or accident, or a scheme, plan, or system in committing the act in question." *Dunham* at ¶ 29, citing *State v. Broom*, 40 Ohio St.3d 277, 533 N.E.2d 682 (1988), paragraph one of the syllabus. "When other acts evidence is relevant for one

of those limited purposes, the court may properly admit it, even though the evidence may show or tend to show the commission of another crime by the accused." *Id*., citing R.C. 2945.59.

{¶91} Here, the State introduced the evidence to show motive, scheme, planning, and knowledge as it pertained to appellant's participation in the offenses charged in the indictment. Therefore, the evidence was admissible pursuant to Evid.R. 404(B) and R.C. 2945.59; and trial counsel did not act deficiently by failing to object to its admission under these rules.

{¶92} Appellant contends that even if the evidence is relevant, his trial counsel still provided ineffective assistance by failing to object to its admission under Evid.R. 403 because the testimony was unduly prejudicial. Evid.R. 403(A) states, "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

{¶93} Here, White testified, inter alia, that appellant would choke her until she passed out, and that he would "fold" up their child Noah until his oxygen supply would be cut-off and he would turn blue. She also testified that appellant would beat her for hours on end. While this testimony is certainly disturbing, it is also highly relevant for the reasons previously discussed. Hence, we find that the probative value of the bad acts testimony outweighs any prejudice to appellant. Therefore, his trial counsel was not ineffective for failing to object to the testimony on the basis of Evid.R. 403.

{¶94} Lastly, appellant contends that his trial counsel's failure to object to the alleged improper remarks of the prosecutor during rebuttal closing argument deprived him of his right to the effective assistance of counsel. However, in resolving appellant's sixth assignment of error, we determined that the prosecutor's remarks during closing arguments were not improper.

Accordingly, because the remarks were not improper, his trial counsel did not perform deficiently by failing to object to the remarks.

{¶95} Based on the foregoing, appellant's fifth assignment of error is overruled.

### I. The Cumulative Error Principle is Inapplicable

{¶96} In his ninth and final assignment of error, appellant contends that cumulative errors committed during his trial deprived him of a fair trial and require a reversal of his convictions. Under the doctrine of cumulative error, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of [the] numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner,* 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995).

{¶97} "Before we consider whether 'cumulative errors' are present, we must first find that the trial court committed multiple errors." *State v. Harrington,* 4th Dist. Scioto No. 05CA3038, 2006–Ohio–4388, ¶ 57, citing *State v. Goff,* 82 Ohio St.3d 123, 140, 694 N.E.2d 916 (1998). Because we have found no errors, the cumulative error principle is inapplicable. Accordingly, we overrule appellant's ninth assignment of error.

### IV. Conclusion

{¶98} Having overruled all of appellant's assignments of error, we affirm the judgment of the trial court.

JUDGMENT AFFIRMED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED. Appellant shall pay the costs.

The Court finds that reasonable grounds existed for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Court of Common Pleas to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. and McFarland, J.: Concur in Judgment and Opinion.

For the Court

By: _____
      Marie Hoover, Presiding Judge

## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**